UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MARCUS B. THORNTON,<br><br>                    Petitioner,<br><br>      v.<br><br>RON HAYNES,<br><br>                    Respondent. | CASE NO. 3:19-CV-5320-RJB-DWC<br><br>REPORT AND RECOMMENDATION<br><br>Noting Date: March 6, 2020 |

The District Court has referred this action to United States Magistrate Judge David W. Christel. Petitioner Marcus B. Thornton, proceeding *pro se* and *in forma pauperis*, filed his federal habeas Petition, pursuant to 28 U.S.C. § 2254, seeking relief from his state court conviction and sentence. *See* Dkt. 4, 5. The Court concludes the state court's adjudication of the grounds raised in the Petition was not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the undersigned recommends the Petition be denied and a certificate of appealability not be issued.

I.      **Background**

A.  Factual Background

On September 24, 2015, in the Superior Court of Washington for Pierce County ("trial court"), a jury found Petitioner guilty of murder in the second degree with a deadly weapon enhancement. *See* Dkt. 12-1, p. 2. Petitioner was sentenced to 244 months confinement on October 1, 2015. *See id*. at pp. 2-10. The Court of Appeals of the State of Washington ("state court of appeals") summarized the facts of Petitioner's case as follows:

I. Trial Testimony

On the afternoon of September 22, 2014, Thornton was on his bike trying to locate John Ware. Thornton let Ware borrow his Bluetooth speaker, but Ware never returned it. Thornton saw Rayneisha Gardner, Ware's girlfriend, flagged her down, and asked where Ware was. Gardner knew Thornton and she told him that she did not know where Ware was.

Gardner asked Thornton whether, several days prior, he had "pulled a knife" on Ware at a mutual friend's house. Report of Proceedings (RP) (Sept. 14, 2015) at 427. Thornton responded that he did pull a knife on Ware. When Gardner asked why he did not put the knife down and just fight him, Thornton stated that he "wouldn't have pulled a knife if he wanted to fight," meaning "[h]e would stab him" over the speaker Ware had not returned. RP (Sept. 14, 2015) at 428. Gardner offered to pay for the speaker, but Thornton refused, stating that the dispute was about "more than just a speaker." RP (Sept. 14, 2015) at 429.

Thornton told Gardner that he should tag along with her because he knew Ware would come to her. When Gardner refused, Thornton stated it was okay because he could "feel [Ware] in the area" and that he would run into him. RP (Sept. 14, 2015) at 432. The remark gave Gardner a "chill." RP (Sept. 14, 2015) at 432. When she told Thornton not to hurt Ware, he chuckled and said, "Oh, I'm not going to hurt him." RP (Sept. 14, 2015) at 432–33. She stated that if he hurt him, she would tell. Gardner had concerns for Ware's safety, but could not warn him because he did not have a cell phone.

On the same day, Ware's friends, Patrice Sims and her boyfriend Anthony Thomas, were at a gas station to buy cigarettes when Thornton approached them on his bicycle. Thomas knew of Thornton, but Thornton was not from the area.

Sims saw Ware in the distance and pointed him out to Thomas and Thornton. Thornton quickly rode off in Ware's direction. Sims and Thomas followed

Thornton because it looked like he was going after Ware. Sims and Thomas caught up to Thornton and saw him and Ware "tussling" on a person's yard. RP (Sept. 16, 2015) at 641. Thornton slammed Ware to the ground. Thornton then got on top of Ware as they continued to fight.

Sims and Thomas saw Thornton holding a knife in his right hand and stabbing Ware while holding his neck. Although Ware carried a bat with him sometimes, Sims and Thomas did not see him with any weapon during the altercation. A neighbor heard a voice say, "No. No. No." RP (Sept. 8, 2015) at 100. Thornton repeatedly told Ware to beg for his life.

Thomas tried to stop the fight. Thornton got off Ware, picked up a baseball bat, threw it at him, and left the scene on his bike. Holding his side, Ware rose, called out to Thomas, walked towards a house, and fell. Ware suffered stab wounds in his left chest, left back shoulder, and left hip. He died minutes after the stabbing. The fatal wound occurred when the knife went through his lung and heart.

Thornton rode to an acquaintance's residence, a "well known drug house." RP (Sept. 15, 2015) at 573. There, Thornton saw Christopher Scales, a close friend of Ware's. Thornton told Scales that he had an altercation with Ware regarding an electronic item and that he stabbed him. He told Scales that "he got him good" and that Ware would need to go to the hospital. RP (Sept. 15, 2015) at 564. He seemed to be bragging about stabbing Ware for "burning him." RP (Sept. 15, 2015) at 565. Thornton did not appear to be injured and he did not say whether or not Ware tried to hurt him. Thornton asked Scales to retrieve a bloody shirt Thornton had thrown under the front porch. He also asked for a ride out of the area. Scales did not help Thornton and left the house.

Later that evening, Thornton texted several people asking for assistance to return to his home in Illinois. He texted one person, "Baby, I'm in trouble. Help me please ... I got to leave Washington ASAP. Can't say much more, but got to go now." RP (Sept. 16, 2015) at 765. None of his text messages mentioned what happened with Ware.

The police found a baseball bat in the vicinity of the crime scene, but the knife and Thornton's shirt were never located. The police arrested Thornton two days later. The State charged him with murder in the first degree with a deadly weapon and murder in the second degree with a deadly weapon. Thornton pleaded not guilty to both charges.

II. Thornton's Testimony

Thornton claimed he acted in self-defense. He met Ware several days before the incident when Ware asked Thornton to use his Bluetooth speaker. Thornton lent him the speaker and did not see him again until the day of the incident. Thornton admitted to talking with Gardner that day, but denied ever telling her that he pulled

a knife on Ware. Thornton said that after Sims pointed out Ware, he only followed him because he wanted to talk to him about the speaker.

When Thornton caught up to Ware, he saw Ware go to the back of a house and pick up a baseball bat. Ware looked at Thornton, said, "What's up?" and ran towards him with the baseball bat "cocked." RP (Sept. 21, 2015) at 825. He hit Thornton in the ribs with the bat and the two began to struggle for the bat. When one of Ware's hands released the bat, Thornton saw Ware wielding a knife with the same hand. As they struggled, Ware tripped and fell onto his back, pulling Thornton down with him. Thornton attempted to get up, but Ware pulled him back down, wanting to fight. When Thornton eventually got up, he saw Ware get up and look for the bat. As Thornton got on his bike and rode off, he turned back to see Ware walking towards a house.

Thornton rode to the drug house, took off his shirt, and hung it on the porch banister. The shirt had no blood on it. He later asked an acquaintance to get his shirt off the porch. He went inside and asked about buying "crystal meth" for someone. RP (Sept. 21, 2015) at 833. Thornton saw Scales at the house, but did not talk to him. He left the house several minutes later so he could purchase methamphetamine at another location.

When Thornton sent out the text messages later that evening, he did not know of Ware's condition. He did not have a knife and did not know Ware was stabbed. Thornton sent messages for help because he thought Ware was trying to find him and he had concerns for his safety. He felt alone and wanted to get out of the area. He denied being the first aggressor and denied stabbing Ware.

III. Motion in Limine

Pretrial, the State moved to exclude evidence of Scales's former Crips gang affiliation. Because Ware was also a Crip, Thornton wanted to show Scales's bias by presenting evidence that both Ware and Scales had affiliations with Tacoma's Hilltop neighborhood, a "Crip area," and that they had a "tie" or "bond" between them. RP (Sept. 8, 2015) at 23–24, 29. He anticipated that the State would call witnesses who were friends with Ware as Thornton was fairly unknown in the community.

The trial court ruled that it must apply an ER 404(b) analysis because gang affiliation evidence cannot be offered for a propensity purpose. Even though Thornton argued that the evidence would be offered to show bias, the court decided it needed to consider the evidence's prejudicial effect. It granted the State's motion, ruling that the risk of unfair prejudice greatly outweighed the probative value of proving bias.

Although the judge excluded the gang affiliation evidence, the jury did hear other impeachment evidence including Scales's convictions and his incarceration for

attempting to elude a police officer and possession of a stolen vehicle. It also heard that while Scales was in custody, he wrote to the prosecutor's office about information regarding this case. Scales knew that Thornton planned to assert an insanity defense, and Scales was prepared to testify that Thornton was not insane because Thornton was "cognitiv[e]" and "nonchalant" when he came to the drug house. RP (Sept. 15, 2015) at 610–11. Scales did not get a deal for testifying in Thornton's trial, but he nevertheless wanted to testify because Ware "was like family." RP (Sept. 15, 2015) at 582. The jury also heard that Scales received a deal to be a State's witness in an unrelated case. Thornton cross-examined Scales about his convictions, plea deals, and other potential deals.

IV. First Aggressor Instruction

Thornton objected to the trial court giving a first aggressor jury instruction, arguing that it was not supported by the evidence. Thornton did not object to the first aggressor instruction on any other basis. The trial court found that substantial evidence supported the instruction:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self defense and thereupon kill another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

Clerk's Papers (CP) at 110 (Instr. 25). The trial court also instructed the jury on self-defense.

V. Closing Arguments

During closing argument, the State discussed the conversation between Gardner and Thornton. It stated that Gardner offered to pay for the speaker, but Thornton declined because it was not about the speaker, but the principle. Thornton objected, arguing that the statement was not Gardner's testimony and it was a fact not in evidence. The trial court reminded the jury that the attorneys' comments are not evidence. The State continued, arguing:

> [Thornton] chuckled when [Gardner] told him not to hurt Ware, to which he said, "Oh, I'm not going to hurt him. I'm going to kill him."

RP (Sept. 22, 2015) at 980. Thornton did not object to this statement.

The State also used a PowerPoint presentation in closing. It included slides on evidence admitted at trial and jury instructions, including the elements of the crimes, definitions, and the State's burden of proof. One of the slides showed two admitted photographs of Ware's body at the scene of the crime with a caption that

read, "What Does Murder Really Look Like." Supplemental (Suppl.) CP at 171; Br. of Appellant at 8; Br. of Resp't at 23. In reference to the photographs, the State reminded the jurors not to evaluate death based on their exposure to crime drama on TV:

> I do often make reference to TV ... because we all watch or are affected to some degree by it. ... That's where we form a lot of our understanding. Frankly, one of the most ... frequent type of genre or topic you see is law enforcement on television. ... [W]e never really actually see what it really truly looks like. And Exhibits 37 and 129, which are admitted into evidence, this is what it looks like.

RP (Sept. 22, 2015) at 966.

The jury acquitted Thornton of murder in the first degree, but found him guilty of murder in the second degree with a deadly weapon. Thornton appeals.

*State v. Thornton*, 198 Wash. App. 1026, 2017 WL 1164652, at *1-4 (2017); *see also* Dkt. 12-1, pp. 17-23.

B. Procedural Background

1. *Direct Appeal*

Petitioner challenged his Pierce County Superior Court conviction and sentence on direct appeal. *See* Dkt. 5-1, pp. 34-71, 73-117. The state court of appeals affirmed Petitioner's conviction and sentence. *Id*. at pp. 17-32. Petitioner sought discretionary review by the Washington State Supreme Court ("state supreme court"). *See id*. at pp. 119-60. On August 2, 2017, the state supreme court denied Petitioner's petition for review without comment. *Id*. at p. 162. The state court of appeals issued its mandate on August 18, 2017. *Id*. at p. 164.

2. *Personal Restraint Petition*

On January 29, 2018, Petitioner filed a personal restraint petition ("PRP") seeking state post-conviction relief. *See* Dkt. 12-1, pp. 166-261. The state court of appeals dismissed the PRP on June 8, 2018. Dkt. 12-2, pp. 239-41. Petitioner sought discretionary review from the state supreme court, which was denied by the commissioner of the state supreme court on December

1    10, 2018. Dkt. 12-2, pp. 243-71, 273-78. Petitioner moved to modify the deputy commissioner's

2    decision. *Id*. at pp. 280-299. The state supreme court denied the motion to modify without

3    comment and the state court of appeals issued the certificate of finality on March 13, 2019. *Id*. at

4    pp. 301, 303.

5           3.    *Federal Petition*

6         On April 19, 2019, Petitioner initiated this case. Dkt. 1. In his Petition (Dkt. 4) and

7    Memorandum of Law in Support of Habeas Corpus (Dkt. 5), Petitioner raised the following six

8    grounds for relief:

9      1.   The first aggressor jury instruction violated Petitioner's right to present a defense of self-defense and relieved the state of its burden of proof.

10      2.   Petitioner's right to effective assistance of counsel was violated when defense counsel failed to argue the first aggressor jury instruction stripped Petitioner of his self-defense theory.

11

12      3.   Petitioner's confrontation clause rights were violated when he was not allowed to present evidence that a witness, Christopher Scales, was associated with the Crips gang.

13      4.   Petitioner's right to effective assistance of counsel was violated when defense counsel failed to object, on confrontation clause grounds, to the trial court's ruling regarding counsel's ability to elicit testimony related to Mr. Scales's association with the Crips gang.[1]

14

15      5.   Petitioner's speedy trial rights were violated.

16      6.   The state engaged in prosecutorial misconduct when the prosecution:
       a.   Used an inflammatory PowerPoint slide showing photographs of the victim's body with the caption "What Does Murder Really Look Like;"

17         b.   Improperly testified to facts not in evidence; and
       c.   Improperly vouched for Mr. Scales and law enforcement officers.

18    Dkt. 5. On July 25, 2019, Respondent filed, and served on Petitioner, an Answer and

19    Memorandum of Authorities. Dkt. 12. In the Answer, Respondent asserted the state court's

20

21

22

23        [1] The Court recognizes that Ground 4 was not explicitly pled as a separate and distinct ground; however, liberally construing Petitioner's *pro se* pleadings, the Court finds Petitioner has sufficiently raised an independent ineffective assistance of counsel claim related to the Confrontation Clause.

24

1  adjudication of the grounds raised in the Petition was not contrary to, or an unreasonable

2  application of, clearly established federal law. *Id*. Petitioner did not file a traverse.

3         On October 2, 2019, the Court directed Respondent to file a supplemental answer as the

4  Court interpreted the Petition to raise an additional ground not addressed by Respondent. Dkt.

5  13. The Court also directed Respondent to provide a more legible copy of a portion of the state

6  court record, if available. *Id*. On October 24, 2019, Respondent filed the supplemental answer

7  and a supplement to the state court record. Dkt. 14, 15. Petitioner did not file a supplemental

8  traverse.

9  **II.    Discussion**

10        Respondent maintains the state courts' adjudication of the grounds raised in the Petition

11  was not contrary to, or an unreasonable application of, clearly established federal law. Dkt. 11,

12  14.

13     A.  Standard of Review

14        Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the

15  basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a

16  decision that was contrary to, or involved an unreasonable application of, clearly established

17  Federal law, as determined by the Supreme Court of the United States." In interpreting this

18  portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to"

19  clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion

20  opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts

21  "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite

22  result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

23        Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply

24  because that court concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An unreasonable application of Supreme Court precedent occurs "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court decision involves an unreasonable application of Supreme Court precedent "'if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529 U.S. at 407).

The Anti-Terrorism Effective Death Penalty Act ("AEDPA") requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of state court decisions under §2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

The Court notes a state court adjudicates a claim "on the merits" for purposes of § 2254(d) when it decides the petitioner's right to relief based on the substance of the federal claim, rather than on another basis precluding state court merits review. *Runningeagle v. Ryan*, 686 F.3d 758, 768–69 (9th Cir. 2012) (citing *Harrington v. Richter*, 562 U.S. 86, 98-100 (2011) (when a state court decision is ambiguous, and so it is "a close question" on whether the state court denied a petitioner's claim on procedural grounds or on the merits, a federal court must presume that the state court adjudicated the claim on the merits)).

1    Here, the state court stated it was not deciding two claims raised in the Petition (Grounds

2    1 and 3).  However, the state court discussed the constitutionality of all the claims raised in the

3    Petition based on the substance of federal law. The Court finds the state court decisions were,

4    therefore, adjudications "on the merits" for the purposes of AEDPA. Furthermore, Petitioner

5    does not assert the state court decisions do not constitute a merits adjudication; rather, Petitioner

6    asserts the state courts' determinations were contrary to, or an unreasonable application of,

7    clearly established federal law. *See* Dkt. 5. Thus, Petitioner has waived any argument to the

8    contrary. *See Martinez v. Cate*, 903 F.3d 981, 991 (9th Cir. 2018) (finding the petitioner

9    abandoned any claim that the state court's determination was not an adjudication on the merits

10    when the argument was raised for the first time at oral argument).

11    B.    Improper Jury Instruction (Ground 1)

12    In Ground 1, Petitioner alleges the trial court's improper first aggressor jury instruction

13    violated Petitioner's right to present a defense of self-defense and relieved the state of its burden

14    of proof. Dkt. 5.

15    "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for

16    habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). In a habeas case, the question before

17    the Court is "whether the ailing [jury] instruction by itself so infected the entire trial that the

18    resulting conviction violates due process." *Id*. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147

19    (1973)). "Where, for example, a jury instruction relieves the prosecution of its burden in proving

20    every element of the offense beyond a reasonable doubt, the jury instruction violates due process."

21    *Roettgen v. Ryan*, 639 F. Supp. 2d 1053, 1066 (C.D. Cal. 2009) (citing *Middleton v. McNeil*, 541

22    U.S. 433, 437 (2004)). If the Court is reviewing an ambiguous instruction, the inquiry is "'whether

23    there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that

24

1    violates the Constitution." *Id*. (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)). The

2    challenged jury instruction "must be considered in the context of the instructions as a whole and

3    the trial record." *Estelle*, 502 U.S. at 72.

4        In determining the trial court properly gave the first aggressor jury instruction, the state

5    court of appeals stated:

6        Thornton contends that the trial court erred by giving a first aggressor instruction
         because Thornton's lawful conduct was insufficient to show that he was the first
7        aggressor. We disagree.

8        Whether the State produced sufficient evidence to justify a first aggressor
         instruction is a question of law we review de novo. *State v. Bea*, 162 Wn. App. 570,
9        577, 254 P.3d 948 (2011). We view the evidence in the light most favorable to the
         party requesting the instruction. *Wingate*, 155 Wn.2d at 823 n.1 (citing *State v.
10       Fernandez–Medina*, 141 Wn.2d 448, 455–56, 6 P.3d 1150 (2000)).

11       A trial court "properly submits [a first] aggressor instruction where (1) the jury can
         reasonably determine from the evidence that the defendant provoked the fight; (2)
12       the evidence conflicts as to whether the defendant's conduct provoked the fight; or
         (3) the evidence shows that the defendant made the first move by drawing a
13       weapon." *State v. Anderson*, 144 Wn. App. 85, 89, 180 P.3d 885 (2008) (citing
         *Riley*, 137 Wn.2d at 909–10). The court errs in submitting the instruction if the
14       evidence shows the defendant used only words to provoke the fight. *Anderson*, 144
         Wn. App. at 89.

15
         At trial, the parties presented conflicting evidence as to whether Thornton's acts
16       provoked the response by Ware. The State submitted evidence showing that
         Thornton was actively looking to stab Ware, and once he spotted Ware, Thornton
17       chased him down. Thornton submitted evidence that he only wanted to speak to
         Ware and that Ware charged at him with a bat and pulled a knife. Recognizing the
18       presence of conflicting evidence, the trial court gave the first aggressor instruction.

19       The trial court followed the directive in *Riley* that such an instruction is appropriate
         if there is conflicting evidence as to whether the defendant's conduct precipitated
20       the fight. 137 Wn.2d at 910. Based on the conflicting evidence, a jury could
         reasonably infer that, within the context of Thornton having pulled a knife on Ware
21       days before his death, Thornton actively searched for Ware, aggressively
         approached him, and attacked him. A reasonable jury could find that Thornton's
22       acts were intentional and reasonably likely to provoke a belligerent response from
         Ware. We, therefore, conclude that in light of the conflicting evidence as to whose
23       actions precipitated the fight, the first aggressor instruction was proper.

24

1 │ *Thornton*, 198 Wash. App. 1026, 2017 WL 1164652 at *5; Dkt. 12-1, pp. 25-26.

2 │       The state court of appeals declined to consider whether the first aggressor jury instruction

3 │ lowered the State's burden of proof because Petitioner did not object to the instruction for this

4 │ reason at trial. *Thornton*, 198 Wash. App. 1026, 2017 WL 1164652 at *4; Dkt. 12-1, pp. 23-25.

5 │ However, the state court of appeals reviewed the constitutionality of Petitioner's claim, stating:

6 │       Thornton argues that the trial court's first aggressor instruction violated his due
 │       process rights by impermissibly lowering the State's burden of disproving self-
7 │       defense beyond a reasonable doubt. He asserts that the use of the word "intentional" in
 │       the corresponding Washington Pattern Jury Instructions Criminal (WPIC)
8 │       lowered the State's burden of proof and precluded a self-defense claim where any
 │       intentional act, even a lawful one, may provoke a belligerent response. We decline
9 │       to address this argument.

10 │       At trial, Thornton did not object to the first aggressor instruction on the grounds that
 │       he now asserts, i.e., that it lowered the state's burden of disproving self-defense.
11 │       Instead, he only excepted to it on the basis that insufficient evidence supported the
 │       instruction.
12 │
 │       We need not consider issues that are raised for the first time on appeal unless the error
13 │       is manifest and truly of constitutional dimension. *State v. Kirkman*, 159 Wn.2d 918,
 │       926, 155 P.3d 125 (2007); RAP 2.5(a)(3). Parties raising constitutional issues [on
14 │       appeal] must present considered arguments to this court. *State v. Bonds*, 174 Wn.
 │       App. 553, 567 n.2, 299 P.3d 663 (2013); RAP 2.5(a)(3). " '[N]aked castings into the
15 │       constitutional sea are not sufficient to command judicial consideration and
 │       discussion.' " *Bonds*, 174 Wn. App. at 567 n.2 (quoting *State v. Johnson*, 119 Wn.2d
16 │       167, 171, 829 P.2d 1082 (1992)). A defendant must identify the constitutional error
 │       and show how the error actually prejudiced him and affected his rights at trial.
17 │       *Kirkman*, 159 Wn.2d at 926–27. If a court determines the claim raises a manifest
 │       constitutional error, it may still be subject to harmless error analysis. *Kirkman*, 159
18 │       Wn.2d at 927.

19 │       The trial court's first aggressor instruction recited, verbatim, WPIC 16.04 which the
 │       Washington State Supreme Court approved in *State v. Riley*, 137 Wn.2d 904, 908–
20 │       09, 976 P.2d 624 (1999). *Riley* acknowledged that "[w]hile [a first] aggressor
 │       instruction should be given where called for by the evidence, [it] impacts a
21 │       defendant's claim of self-defense, which the State has the burden of disproving
 │       beyond a reasonable doubt." 137 Wn.2d at 910 n.2.
22 │
 │       Thornton, however, does not show how giving the first aggressor instruction
23 │       approved in *Riley* constituted error, let alone manifest error effecting a constitutional
 │       right. Although he seems to argue that the instruction is erroneous because it did not
24 │

1    require the provoking act to be unlawful, a first aggressor instruction does not require
2    the provoking act to be unlawful. *See State v. Wingate*, 155 Wn.2d 817, 822, 122
    P.3d 908 (2005).

3    Thornton does not make a clear showing that the instruction as applied to the facts of
4    his case was incorrect or that it impermissibly lowered the State's burden of proof.
    Nor does he show actual prejudice affecting his rights at trial. Because Thornton
    cannot show how the error actually prejudiced him, we do not consider the alleged
5    error and limit our review to the evidentiary objection.

6  *Thornton*, 198 Wash. App. 1026, 2017 WL 1164652 at *4 (footnotes omitted); Dkt. 12-1, pp. 23-

7  25.

8        "All challenged instructions" must be "considered in light of all of the jury instructions

9  and the trial record as a whole." *Mendez v. Knowles*, 556 F.3d 757, 768 (9th Cir.2009).[2] Here,

10  the jury received the first aggressor jury instruction, which read:

11    No person may, by any intentional act reasonably likely to provoke a belligerent
    response, create a necessity for acting in self defense and thereupon kill another
12    person. Therefore, if you find beyond a reasonable doubt that the defendant was the
    aggressor, and that defendant's acts and conduct provoked or commenced the fight,
13    then self-defense is not available as a defense.

14  Dkt. 12-2, p. 165. The jury also received jury instructions on justifiable homicide and excusable

15  homicide. *See* Dkt. 12-2, pp 161, 167. In Jury Instruction No. 21, the jury was instructed that

16  "[t]he State has the burden of proving beyond a reasonable doubt that the homicide was not

17  justifiable. If you find that the State has not proved the absence of this defense beyond a

18  reasonable doubt, it will be your duty to return a verdict of not guilty." *Id*. at p. 161. The

19  excusable homicide jury instruction included a nearly identical statement regarding the burden of

20  proof. *Id*. at p. 167.

21

22

23      [2] Although Supreme Court precedent provides the only relevant source of clearly established federal law
  for AEDPA purposes, circuit precedent can be "persuasive authority for purposes of determining whether particular
  state court decision is an 'unreasonable application' of Supreme court law," and in ascertaining "what law is 'clearly
24  established.'" *Duhaime v. Ducharme,* 200 F.3d 597, 600–01 (9th Cir. 2000).

1   The state court of appeals concluded the first aggressor instruction was proper under state

2 law in light of the evidence presented at trial. The State presented evidence showing Petitioner

3 "pulled a knife" on Ware days before the stabbing and, on the day of the stabbing, Petitioner was

4 trying to locate Ware and pursued Ware when he saw him. *See* Dkt. 12-5, p. 139. As there was

5 evidence presented to the jury that could show Petitioner took intentional acts that were likely to

6 provoke a belligerent response, Petitioner has not shown the first aggressor instruction was

7 improper. *See State v. Riley*, 137 Wash.2d 904, 910 (1999) (reaffirming that an aggressor

8 instruction "is appropriate if there is conflicting evidence as to whether the defendant's conduct

9 precipitated a fight"); *State v. Williams*, 132 Wash.2d 248, 259 (1997) ("Each side is entitled to

10 have the jury instructed on its theory of the case if there is evidence to support that theory.").

11 Regardless, Petitioner cannot show he is entitled to habeas relief where the state court

12 determined the jury instruction was proper under state law. *See Aslanyan v. Herzog*, 2014 WL

13 7272437, at *15 (W.D. Wash. Dec. 17, 2014) (finding the petitioner was not entitled to habeas

14 relief where the state court concluded a first aggressor jury instruction was proper under state

15 law).

16   Further, Petitioner has not shown the inclusion of the first aggressor jury instruction

17 lowered the state's burden of proof or denied him the ability to assert a theory of self-defense,

18 violating due process. The jury instructions included instructions that clearly explained the

19 burden of proof was on the state to prove, beyond a reasonable doubt, that the homicide was not

20 justified or excusable. Further, there was conflicting evidence regarding whether Petitioner was

21 the first aggressor or acting in self-defense. *See* Dkt. 12-5, pp. 133-39. Considering the trial

22 evidence and jury instructions as a whole, Petitioner fails to show the first aggressor jury

23 instruction relieved the State of its burden of proof or stripped Petitioner of his self-defense

24

REPORT AND RECOMMENDATION - 14

1   theory. Therefore, Petitioner has not shown the trial court's decision to give a first aggressor jury

2   instruction so infected the entire trial that Petitioner's conviction violates due process. *See*

3   *Grubham v. Obenland*, 2017 WL 4839081, at *23 (W.D. Wash. Feb. 8, 2017) (finding no due

4   process violation where the plain language of the jury instructions did not relieve the State of its

5   burden and there was conflicting evidence regarding whether the petitioner was the first

6   aggressor or acting in self-defense); *Husband v. Ryan*, 2015 WL 1799997, at *27 (D. Ariz. Apr.

7   16, 2015) (finding the petitioner was not entitled to habeas relief when the challenged

8   instruction, in the context of all of the instructions given to the jury, did not have the effect of

9   relieving the state of the burden of proof).

10         In sum, the Court concludes the state court's determination that Petitioner's rights were

11  not violated when the trial court gave a first aggressor jury instruction was not contrary to, or an

12  unreasonable application of, clearly established federal law. Accordingly, the Court finds Ground

13  1 should be denied.

14         C.   Confrontation Clause (Ground 3)

15         In Ground 3, Petitioner contends his Confrontation Clause rights were violated when he

16  was not allowed to present evidence that a witness, Christopher Scales, was associated with the

17  Crips gang. Dkt. 5, pp. 15-17. Specifically, Petitioner asserts the trial court did not allow

18  Petitioner to elicit critical evidence from Scales during cross-examination. *Id.*

19         The Confrontation Clause of the Sixth Amendment provides: "In all criminal

20  prosecutions, the accused shall enjoy the right . . . to be confronted by the witnesses against

21  him." U.S. Const. Amend. VI. The Confrontation Clause applies to the states through the

22  Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403 (1965), and it guarantees criminal

23  defendants the right to confront and cross-examine the witnesses against them. *Chambers*, 410

24

U.S. at 294-95. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). This right includes the right to cross-examine adverse witnesses to attack their general credibility or show their possible bias or self-interest in testifying. *Olden v. Kentucky*, 488 U.S. 227, 231 (1988).

Despite this constitutional guarantee, trial judges retain wide latitude to impose reasonable limits on cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v Van Arsdall*, 475 U.S. 673, 679 (1986). A trial court's restrictions on the defendant's right to cross-examine witnesses may not be "arbitrary or disproportionate to the purposes they are designed to serve" and may not prohibit all inquiry into the possibility that a witness is biased. *Ortiz v. Yates*, 704 F.3d 1026, 1034, 1035 (9th Cir. 2012) (quotations omitted) (citing *Michigan v. Lucas*, 500 U.S. 145, 151 (1991)). Generally, the Confrontation Clause is satisfied when the defendant has the opportunity to show the weaknesses in a witness's testimony and undermine a witness's credibility. *Hayes v. Ayers*, 632 F.3d 500, 518 (9th Cir. 2011) (citations omitted) ("No Confrontation Clause violation occurs as long as the jury receives sufficient information to appraise the biases and motivations of the witness.").

In declining to consider whether Petitioner's Sixth Amendment right to confront Scales was violated, the state court of appeals considered the substantive federal issue, stating:

> Thornton argues that his right to confrontation was violated when the trial court prohibited him from cross-examining Scales about being a member of the Crips gang. He argues that being prohibited from exposing Scales's bias was prejudicial to his case. Because Thornton cannot show manifest error affecting a constitutional right, we decline to decide the issue.
>
> The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees a defendant the opportunity to confront witnesses against

him or her through cross-examination. *State v. Fisher*, 165 Wn.2d 727, 752, 202 P.3d 937 (2009). A defendant has the right to confront witnesses against him with bias evidence so long as the evidence is minimally relevant. *Fisher*, 165 Wn.2d at 752.

The trial court has authority to set boundaries regarding the extent to which the defendant may delve into the witness' alleged bias based on concerns such as harassment, prejudice, confusion of the issues, witness' safety, or interrogation that is repetitive or only marginally relevant. *Fisher*, 165 Wn.2d at 752. We uphold a trial court's ruling on the scope of cross-examination absent a finding of manifest abuse of discretion. *Fisher*, 165 Wn.2d at 752.

Under RAP 2.5(a)(3), an appellant may not raise a claim of error on appeal that was not raised at trial, unless he or she demonstrates that the alleged error is manifest and the error is truly of constitutional dimension. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). An error is of constitutional dimension if the asserted claim, if correct, implicates a constitutional interest as compared to another form of trial error. *State v. Grimes*, 165 Wn. App. 172, 186, 267 P.3d 454 (2011). An alleged error is manifest if the error had practical and identifiable consequences at trial. *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011). We place ourselves in the shoes of the trial court when determining if an alleged error had practical and identifiable consequences. *O'Hara*, 167 Wn.2d at 100.

In *State v. O'Cain*, 169 Wn. App. 228, 248, 279 P.3d 926 (2012), Division One of this court held that a clear line of decisions requires that a defendant raise a confrontation clause claim at or before trial, or lose the benefit of the right. (Citing to *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009); *Bullcoming v. New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed 610 (2011); *State v. Jasper*, 174 Wn.2d 96, 271 P.3d 876 (2012); *State v. Hayes*, 165 Wn. App. 507, 265 P.3d 982, *review denied*, 176 Wn.2d 1020 (2013)). However, as stated in *Melendez–Diaz*, States may adopt procedural rules governing objections and the issue is whether RAP 2.5 is such a procedural rule. *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 313–14 n.3, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009).

In *State v. Hart*, we noted that our Supreme Court has not overruled case law which allows defendants to raise an alleged confrontation violation for the first time on appeal if they satisfy the requirements of RAP 2.5(a)(3). 195 Wn. App. 449, 458 n.3, 381 P.3d 142 (2016). We stated that, notwithstanding the sound reasoning in *O'Cain*, 169 Wn. App 228, we would follow *State v. Hieb*, 107 Wn.2d 97, 104–08, 727 P.2d 239 (1986). *Hart*, 195 Wn. App. at 458 n.3. Therefore, we analyze Thornton's claim under RAP 2.5(a)(3).

Pretrial, Thornton unsuccessfully argued that evidence of Scales' (sic) past affiliation with the Crips could be used as bias evidence to establish a "tie" or "bond" between Scales and Ware. RP (Sept. 8, 2015) at 24, 29. After conducting

1    an ER 404(b) analysis, the trial court excluded the evidence. Although evidence of
2    Scales's past affiliation with the Crips was excluded, other evidence was introduced
     at trial to establish Scales's bias and the "tie" between Ware and Scales. The jury
3    heard evidence that Scales worked with the State in the past in exchange for a deal
     on his sentence. It heard about Thornton's (sic) convictions and that he was in jail
4    when he unsuccessfully attempted to get a deal for testifying against Thornton in
     this case. The jury also heard that Scales wanted to testify, even though he did not
     get a deal, because Ware "was like family." RP (Sept. 15, 2015) at 582.

6    Here, the jury heard evidence of numerous reasons why Scales's testimony might
     be biased. Thornton fails to show how, in light of the other impeachment evidence
7    elicited at trial, excluding evidence of Scales's past affiliation with the Crips
     violated his right to confrontation. The trial court properly exercised its discretion
8    in excluding the evidence. Further, Thornton makes no argument showing that the
     alleged constitutional error had practical and identifiable consequences at trial.
9    Because the error was not preserved and Thornton makes no argument or citations
     to authority showing how excluding evidence of Scales's gang affiliation—in light
10   of other bias evidence admitted at trial—was manifest error, we do not decide the
     issue.

11   *Thornton*, 198 Wash. App. 1026, 2017 WL 1164652 at *7-8; Dkt. 12-1, pp. 29-31.

12        As the state court of appeals explained, the state court record shows that, prior to the trial,

13   the State sought to exclude evidence related to the victim, John Ware, and witness gang

14   affiliation. *See* Dkt. 12-3, p. 66. Petitioner's trial counsel sought to include the evidence to show

15   bias. *Id*. Specifically, trial counsel anticipated the State would call lay witnesses that were friends

16   with Ware. *Id*. Trial counsel sought to elicit testimony that both Ware and Scales were affiliated

17   with the Crips gang and, therefore, had a bond. *Id*. After hearing argument from counsel, the trial

18   court ruled that evidence related to Scales's affiliation with the Crips gang would be excluded.

19   *Id*. The trial court reasoned:

20        [T]here is a great risk of unfair prejudice to the opponent of this evidence, meaning
          the jury could be emotionally reacting and inflamed upon hearing this kind of
21        information. It doesn't sound to me . . . like it is real solid information either in
          order to connect up the dots here and show the bias you want to show. I am very
22        concerned about what you contend is the probative value of it, effort at proving bias
          being greatly outweighed in this instance by risk of unfair prejudice. I am not going
23        to permit you to go there.

24

1   *Id*. at p. 73.

2       During the trial, on direct examination, Scales testified that he knew Ware for about a

3 year prior to his death because Ware was Scales's niece's "on-again-off-again boyfriend." Dkt.

4 12-4, p. 107. Scales testified regarding his knowledge of the facts surrounding Ware's death. *Id*.

5 at pp. 114-30. Scales also testified that he has a criminal history and was arrested for eluding and

6 possessing a stolen car in the general time frame of Ware's death. *Id*. at p. 130. The jury also

7 heard that, while in the Pierce County Jail, Scales wrote a letter to the prosecutor's office stating

8 he had information about Petitioner's case. *Id*. at p. 131. He requested, but did not receive, a

9 benefit for testifying in Petitioner's case. *Id*. at p. 135. Scales stated he was testifying in

10 Petitioner's case because Ware was "like family." *Id*.at pp. 135-36. He also testified that he

11 provided information to detectives regarding a separate matter, lowering the potential sentence in

12 his case. *Id*. at pp. 133, 136-37.

13       On cross-examination, Petitioner's trial counsel elicited testimony regarding Scales's

14 bias. Trial counsel asked additional questions regarding Scales's contact with the prosecutor's

15 office while in custody, Scales's desire to "strike a deal," and any benefits Scales was receiving

16 for his cooperation in this case and other cases. *See* Dkt. 12-4, pp. 142-50. Trial counsel also

17 elicited testimony to impeach Scales. *See e.g.*, *id*. at pp. 152-62.

18       Initially, the Court notes that Petitioner's Confrontation Clause claim is premised on a

19 state evidentiary ruling made by the trial court. *See* Dkt. 5. To the extent Petitioner is challenging

20 a state evidentiary ruling, that claim is not cognizable in a federal habeas action *See Jammal v.*

21 *Van de Kamp*, 918, 919–20 (9th Cir.1991) (federal-court habeas petitioner may not challenge

22 evidentiary rulings as being incorrect under *state* law).

23

24

1    Petitioner's claim that he was denied the right to confront based on the exclusion of

2    evidence fails. The trial court found, and the record shows, any gang affiliation had limited

3    relevance to the facts of this specific case. *See* Dkt. 12-3, p. 69. The dispute between Petitioner

4    and Ware was over a Blue-tooth speaker. *See* Section I.A., *supra*. There was no assertion the

5    altercation between Petitioner and Ware occurred because Ware was in a gang. *See* Dkt. 12-3, p.

6    69. Petitioner's trial counsel sought to elicit testimony regarding Ware's and Scales's Crip

7    affiliation to show a bond between Scales and Ware. However, there was not a solid connection

8    to show the bias sought by Petitioner's trial counsel. *See id*. at p 73. Thus, Petitioner fails to

9    show the trial court's decision violated Petitioner's right to confront. *See Kirkorian v. Lopez*,

10    2013 WL 1773844, at *6 (C.D. Cal. Jan. 16, 2013) (finding no violation of the Confrontation

11    Clause when the trial court excluded evidence of gang affiliations to discredit witnesses when

12    there was no evidence showing the conflict had a gang connection).

13    Moreover, Petitioner was able to confront Scales regarding his biases in this case.

14    Petitioner's trial counsel was able to cross-examine Scales regarding his relationship with Ware

15    and his motivations for testifying. The jury heard evidence that Scales and Ware were like

16    family. Scales also testified about his efforts to obtain leniency in his own criminal matters if he

17    testified against Petitioner. As such, Petitioner has not shown how the trial court's decision to

18    exclude the gang affiliation evidence denied Petitioner the ability to confront Scales and question

19    him regarding his bias. *See Hayes*, 632 F.3d at 518 ("No Confrontation Clause violation occurs

20    as long as the jury receives sufficient information to appraise the biases and motivations of the

21    witness."); *Berry v. Davey*, 2017 WL 7310097, at *9 (C.D. Cal. Oct. 25, 2017) ("The

22    Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-

23    examination that is effective in whatever way, and to whatever extent the defense might wish.").

24

REPORT AND RECOMMENDATION - 20

1    For the above stated reasons, the Court concludes the state court's determination that

2    Petitioner's Sixth Amendment rights were not violated when the trial court excluded evidence

3    regarding Scales's gang affiliation was not contrary to, or an unreasonable application of, clearly

4    established federal law. Accordingly, the Court finds Ground 3 should be denied.

5        D.   Ineffective Assistance of Counsel (Grounds 2 and 4)

6    In Grounds 2 and 4, Petitioner alleges he received ineffective assistance of counsel. Dkt.

7    5. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court created a two-part test

8    for determining whether a defendant received ineffective assistance of counsel. First, a defendant

9    must demonstrate his attorney's performance was deficient, which requires showing "counsel

10   made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth

11   Amendment." *Id.* at 687. Second, a defendant must demonstrate the deficient performance

12   prejudiced the defense to such a degree the results of the trial cannot be trusted. *Id.*

13   Under the first prong, the reasonableness of an attorney's performance is to be evaluated

14   from counsel's perspective at the time of the alleged error and in light of all the circumstances.

15   *Id.* at 690. The petitioner must carry a heavy burden, as "reviewing courts must indulge a strong

16   presumption that counsel's conduct falls within the wide range of professional assistance; that is,

17   the defendant must overcome the presumption that, under the circumstances, the challenged

18   action might be considered sound trial strategy." *Id.* at 689 (citation omitted).

19   Under the prejudice prong, a petitioner must establish there is a reasonable probability the

20   results would have been different but for counsel's deficient performance. *Kimmelman v.*

21   *Morrison*, 477 U.S. 365, 375 (1986); *Strickland,* 466 U.S. at 696. "A reasonable probability is a

22   probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[A]

23   court need not determine whether counsel's performance was deficient before examining the

24

prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* at 697.

1. *Ground 2*

In Ground 2, Petitioner contends his trial counsel was ineffective when counsel failed to argue the first aggressor jury instruction stripped Petitioner of his self-defense theory. Dkt. 5, p. 14. In determining Petitioner's trial counsel was not ineffective, the state supreme court stated:

> Mr. Thornton argues that his trial counsel was ineffective because counsel failed to object to the giving of a first aggressor instruction on the ground that the instruction would lower the State's burden of disproving self-defense. Instead, counsel objected on the ground that the instruction was not supported by sufficient evidence. The trial court overruled the objection, and in affirming that ruling on direct appeal, the Court of Appeals noted that it was *not* reaching the issue of whether the instruction stripped Mr. Thornton of a self-defense claim.

> To establish ineffective assistance of counsel, Mr. Thornton must show that counsel's performance was objectively unreasonable and that this is a reasonable probability that, but for counsel's performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). An attorney's strategic and tactical decisions are not subject to second guessing. *State v. Hendrickson*, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996). If a petitioner fails to establish either element of an ineffective assistance claim, this court need not address the other element. *Hendrickson*, 129 Wn.2d at 78.

> The right of self-defense may not be invoked by an aggressor or one who provokes an altercation unless the aggressor first withdraws. *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). Where there is credible evidence from which a jury can reasonably find that the defendant provoked the need to act in self-defense, or there is conflicting evidence as to whether the defendant's conduct precipitated an altercation, an aggressor instruction is appropriate. *Id.* at 909-10.

> At trial, the court instructed the jury with pattern criminal instruction 16.04, which states that a person may not create a necessity for acting in self-defense by taking any "intentional" act reasonably likely to provoke a belligerent response. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.04, at 256 (4th ed. 2016). Mr. Thornton argues that instructing the jury on first aggressor eliminated his right to argue self-defense because any "intentional" act likely to provoke a belligerent response was overly inclusive. He contends that

counsel should have argued that the act had to be both intentional *and* unlawful. The acting chief judge rejected this argument because in *State v. Wingate*, 155 Wn.2d 817, 822, 122 P.3d 908 (2005), this court held that "unlawful" in this context is unconstitutionally vague. In other words, the instruction that Mr. Thornton wanted counsel to request would have been improper under *Wingate*. In his motion for discretionary review, Mr. Thornton merely acknowledges that counsel was ineffective in not objecting to the instruction. Under these circumstances, Mr. Thornton fails to demonstrate a basis for review of this issue under RAP 13.4(b).

Dkt. 12-2, pp. 274-75 (footnote omitted).

The state court record shows that, during the jury instruction conference, Petitioner's trial counsel presented proposed jury instructions for both excusable homicide and justifiable homicide defenses. Dkt. 12-5, p. 91. The trial court determined both proposed instructions requested by the defense would be included in the jury instructions. *Id*. at p. 133. The prosecutor proposed a supplemental instruction on first aggressor. *Id*. In response to the first aggressor instruction, Petitioner's trial counsel argued that there was no evidence showing Petitioner was the first aggressor. *Id*. at pp. 134-37. The trial court determined the first aggressor instruction would be included in the jury instructions, finding there was "substantial evidence in this record that a reasonable jury could infer that [Petitioner's] actions in pursuing Mr. Ware were intentional acts that were likely to provoke a belligerent response, his actions provoked or precipitated the incident, the fight." *Id*. at p. 139. Petitioner's trial counsel, on the record, took exception and objected to the first aggressor instruction, Jury Instruction No. 25, because the evidence did not warrant the instruction. *Id*. at p. 156.

Petitioner now asserts counsel was ineffective when defense counsel failed to argue the first aggressor jury instruction stripped Petitioner of his self-defense theory. Dkt. 5, p. 14. Petitioner only states that "[n]o reasonably competent attorney would have failed to object to instructions which clearly stripped their client of his defense." *Id*. As discussed above, there is no indication from the record Petitioner was denied his right to pursue a self-defense defense.

1    Rather, the record shows the jury received instructions for both justifiable homicide (self-

2    defense) and excusable homicide defenses. Further, the jury instructions specifically stated that

3    burden of proof remained on the State to prove, beyond a reasonable doubt, that the homicide

4    was not justified or was not excusable. Petitioner has not shown the first aggressor jury

5    instruction denied him the ability to pursue a self-defense defense or lowered the State's burden

6    of proof. *See* Section II.B., *supra*. As such, the Court finds Petitioner has not shown his counsel's

7    performance was deficient when he failed to object to the first aggressor jury instruction because

8    it denied Petitioner the ability to purse a self-defense defense.

9        Petitioner has also not demonstrated any prejudice resulted from his counsel's failure to

10   object to the jury instruction on the ground that the first aggressor jury instruction denied

11   Petitioner the ability to pursue a self-defense defense. *See* Dkt. 5, p. 14. Petitioner's trial counsel

12   objected to the instruction. There is no indication that, had trial counsel argued the objection

13   differently, the trial court would have declined to include the first aggressor instruction in the

14   jury instructions. Rather, the trial court found the evidence supported the instruction and noted

15   there was conflicting evidence for the jury to decide if Petitioner was the first aggressor or acting

16   in self-defense. The jury was provided with two separate defenses-to-homicide instructions and

17   the state courts found the jury instructions were consistent with state law. Petitioner has not

18   shown the outcome of the trial would have changed had Petitioner's counsel objected to the first

19   aggressor jury instruction in a different way.

20       For these reasons, the Court concludes the state court's determination that Petitioner's

21   trial counsel was not ineffective for failing to object to the first aggressor jury instruction

22   because it denied Petitioner a self-defense defense was not contrary to, or an unreasonable

23

24

1    application of, clearly established federal law. Accordingly, the Court finds Ground 2 should be

2    denied.

3              2. *Ground 4*

4              In Ground 4, Petitioner asserts his right to effective assistance of counsel was violated

5    when defense counsel failed to object, on confrontation clause grounds, to the trial court's ruling

6    regarding counsel's ability to elicit testimony related to Scales's affiliation with the Crips gang.

7    *Id*. at p. 17.

8              In determining Petitioner's trial counsel was not ineffective for failing to object to the

9    exclusion of evidence showing Scales's affiliation with the Crips gang, the state supreme court

10   stated:

11        [A] defendant has the constitutional right to an opportunity to confront witnesses
          against him through cross-examination. *State v. Fisher*, 165 Wn.2d 727, 752, 202
12        P.3d 937 (2009). A defendant has the right to confront such witnesses with bias
          evidence so long as the evidence is minimally relevant. *Id*. But the right is not
13        absolute; the trial court may set boundaries regarding the extent to which the
          defendant may delve into an alleged bias based on concerns such as harassment,
14        prejudice, confusion of the issues, witness safety, or interrogation that is repetitive
          or only marginally relevant. *Id*. The trial court's ruling is reviewed for a manifest
15        abuse of discretion. *Id*.

16        Here, Mr. Thornton fails to establish manifest abuse of discretion for the same
          reasons that he could not establish manifest constitutional error on direct appeal.
17        As the Court of Appeals noted on direct appeal, the jury heard substantial evidence
          demonstrating a potential bias in Scales's testimony, including that Scales had
18        worked with the State in the past in exchange for a deal on his sentence, and that
          Scales had unsuccessfully attempted to get a deal for testifying against Thornton in
19        this case. In these circumstances, Mr. Thornton cannot demonstrate that the trial
          court abused its discretion in prohibiting him from cross-examining Scales about
20        being a member of a street gang. For the same reasons, Mr. Thornton cannot
          demonstrate any prejudice arising from counsel's failure to object based on the right
21        to confront witnesses.

22   Dkt. 12-2, pp. 276-77 (footnote omitted).

23

24

1    As discussed above, Section II.C., *supra*, the State sought to exclude any evidence

2  showing gang affiliations. *See* Dkt. 12-3, pp. 66. Petitioner's trial counsel objected to this

3  exclusion when presenting argument on the motions in limine. *See id*. Petitioner's trial counsel

4  argued that he anticipated the State would call lay witnesses that were Ware's friends. *Id*. For

5  purposes of establishing bias, trial counsel sought to elicit testimony that both Ware and Scales

6  were affiliated with the Crips gang. *Id*. After hearing argument from counsel, the trial court ruled

7  that evidence related to Scales's affiliation with the Crips gang would be excluded. *Id*. at p. 73.

8    During trial, on cross-examination, Petitioner's trial counsel elicited testimony regarding

9  Scales's bias. Trial counsel asked questions regarding Scales's contact with the prosecutor's

10  office while in custody, Scales's desire to "strike a deal," and any benefits Scales's was receiving

11  for his cooperation in this case and other cases. *See* Dkt. 12-4, pp. 142-50. Trial counsel also

12  elicited testimony to impeach Scales. *See e.g.*, *id*. at pp. 152-62.

13    The record shows Petitioner's trial counsel argued against the State's motion to exclude

14  the evidence. While trial counsel did not explicitly state that exclusion of the evidence would

15  violate the Confrontation Clause, defense counsel argued the gang affiliation evidence was

16  relevant to show witness bias, an aspect of the right to confront. The trial court granted the

17  motion to exclude the evidence, despite defense counsel's argument. As counsel argued the

18  evidence was necessary to show bias, Petitioner fails to explain how his counsel's performance

19  was unreasonable.

20    Petitioner has also not shown any prejudice. On cross-examination, trial counsel elicited

21  testimony showing Scales's bias. The state courts and this Court have found Petitioner failed to

22  show his right to confront was violated by the exclusion of this evidence. Petitioner has also not

23  shown the result of the trial would have been different had additional evidence showing Scales's

24

1   bias been introduced during cross-examination. Therefore, Petitioner has not shown prejudice.

2   *See Stock v. Frink*, 2016 WL 11423534, at *11 (D. Mont. Feb. 9, 2016), *report and*

3   *recommendation adopted*, 2016 WL 4154340 (D. Mont. Aug. 5, 2016) (finding counsel was not

4   ineffective for failing to object because no prejudice was established when the trial court made

5   pre-trial rulings regarding the evidence during arguments on motions in limine); *Tilbury v. Fox*,

6   2016 WL 4073337, at *26 (N.D. Cal. Aug. 1, 2016) (concluding the petitioner could not show

7   the trial court would have sustained an objection regarding the exclusion of evidence given that

8   the trial court had already denied defense counsel's motion in limine).

9       For these reasons, the Court concludes the state court's determination that Petitioner's

10  trial counsel was not ineffective for failing to object to the exclusion of gang affiliation evidence

11  was not contrary to, or an unreasonable application of, clearly established federal law.

12  Accordingly, the Court finds Ground 4 should be denied.

13      E.  <u>Prosecutorial Misconduct (Ground 6)</u>

14      In Ground 6, Petitioner contends the State engaged in prosecutorial misconduct when the

15  prosecutor (1) used an inflammatory PowerPoint, (2) improperly testified regarding facts not in

16  evidence, and (3) improperly vouched for the State's witness.

17      In determining if a prosecutor's conduct rises to the level of prosecutorial misconduct, the

18  relevant inquiry is whether the prosecutor's conduct "so infected the trial with unfairness as to

19  make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168,

20  181 (1986); *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (per curiam) (*Darden* standard is

21  "clearly established Federal law" for purposes of 28 U.S.C. § 2254(d)). A trial error is presumed

22  to be harmless unless the error had "substantial or injurious effect or influence in determining the

23  jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). It is the petitioner's burden to

24

1  state facts that point to a real possibility of constitutional error in this regard. *See O'Bremski v.*

2  *Maass*, 915 F.2d 418, 420 (9th Cir. 1990).

3  To determine if a due process violation occurred, the court "must consider the probable

4  effect of the prosecutor's [comments] on the jury's ability to judge the evidence fairly." *United*

5  *States v. Young*, 470 U.S. 1, 12 (1985). To do so, the prosecutor's remarks must be viewed in

6  context. *See Boyde v. California,* 494 U.S. 370, 385 (1990); *United States v. Robinson,* 485 U.S.

7  25, 33–34 (1988); *Williams v. Borg,* 139 F.3d 737, 745 (9th Cir.1998). The Court may consider

8  whether the prosecutor's comments manipulated or misstated the evidence, whether the trial

9  court gave a curative instruction, and the weight of the evidence against the accused. *Darden*,

10  477 U.S. at 181–82.

11  1.  *Inflammatory PowerPoint*

12  Petitioner first argues the State engaged in prosecutorial misconduct when the prosecutor

13  used an inflammatory PowerPoint slide showing photographs of Ware's body with the caption

14  "What Does Murder Really Look Like." Dkt. 5, pp. 24-27. In determining the State did not

15  engage in prosecutorial misconduct, the state court of appeals stated:

> 16  Thornton argues that he did not receive his right to a fair trial because the State
> 17  showed images of Ware' s bloodied body during closing argument with a caption
> equating the images to what murder looked like, thereby inflaming the jury's
> passion and prejudice. Assuming without deciding that the State used improper
> 18  captions with its PowerPoint presentation during closing, we conclude that an
> instruction to the jury would have cured any prejudice.
>
> 19
>
> 20  During closing argument, the State displayed a PowerPoint slide with two
> photographs that had been admitted into evidence showing Ware's body at the
> crime scene. However, the State added a caption stating, "What Does Murder
> 21  Really Looks Like." Supp. CP at 171; Br. of Appellant at 8; Br. of Resp't at 23. In
> reference to the photographs, the State reminded the jurors not to evaluate death
> 22  based on their exposure to crime drama on TV. Thornton did not object to the slide.
>
> 23  The undisputed evidence showed Ware received multiple stab wounds that caused
> his death. Even if we assume the caption was inflammatory, it was not so flagrant

24

and ill-intentioned that no instruction could have cured the prejudice. The jury had already seen the admitted photos of Ware's body, and given the overwhelming evidence presented at trial a curative instruction to ignore the caption would have cured any asserted prejudice. We, therefore, conclude that there was no prosecutorial misconduct.

*Thornton*, 198 Wash. App. 1026, 2017 WL 1164652 at *6; Dkt. 12-1, pp. 27-28.

The state court record shows that the jury received the following instruction prior to closing arguments:

The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

Dkt. 12-2, p. 140.

During her closing argument, the prosecutor showed a 46-slide PowerPoint presentation. *See* Dkt. 15-1. The presentation included one slide with two photographs of Ware's body and the title "What Does Murder Really Look Like." Dkt. 15-1. The two photographs on the slide had been admitted into evidence. *See* Dkt. 12-5, p. 174. The prosecutor argued that most people form their understandings from television. *Id*. She then argued that the photographs of Ware are what murder actually looks like. *Id*. The defense did not object to the slide or argument.

Here, Petitioner has not shown that the single slide impacted the jury's ability to assess the evidence fairly. The slide contained photographs that were admitted into evidence during the trial. There was evidence supporting the State's theory that Ware was murdered. *See* Section I.A., *supra* (factual background discussing evidence in this case); *United States v. Sayetsitty,* 107 F.3d 1405, 1409 (9th Cir.1997) (stating that prosecutors may make reasonable inferences from the evidence presented at trial). Further, the jury was instructed that the attorneys' statements were not evidence. The Court also notes this slide was near the beginning of the prosecutor's

1    lengthy closing argument and prior to defense counsel's closing argument. *See* Dkt. 12-5, pp.

2    159-244. Petitioner has not shown how the words "What Murder Really Looks Like" on one

3    slide had "substantial or injurious effect or influence in determining the jury's verdict." *Brecht*,

4    507 U.S. at 637; *see also Smith v. Hawaii*, 2007 WL 1853982, at *11 (D. Hawai'i June 25, 2007)

5    (finding slides of newborn baby and the text "My father killed me" only supported reasonable

6    inferences from the evidence and were not unduly prejudicial).

7        Therefore, the Court concludes the state court's determination that the prosecutor's

8    PowerPoint slide did not rise to prosecutorial misconduct was not contrary to, or an unreasonable

9    application of, clearly established federal law. Accordingly, the Court finds this claim should be

10    denied.

11        2.  *Misstatement of the Evidence*

12        Second, Petitioner contends the State engaged in prosecutorial misconduct by improperly

13    testifying about facts not in evidence. Dkt. 5, p. 28-30. Specifically, Petitioner contends the

14    prosecutor misquoted a witness, Rayneisha Gardner, as saying Petitioner told Gardner he was

15    going to kill Ware. *Id.*

16        In determining the State did not engage in prosecutorial misconduct, the state court of

17    appeals stated:

18        Thornton also argues that the prosecutor impermissibly testified to facts not in
         evidence when the prosecutor stated that Thornton said he was going to kill Ware.
19        He argues that because the misstatement went directly to the primary factual issue
         at trial—whether Thornton intended to hurt Ware—there was a substantial
20        likelihood that the misconduct affected the outcome of his case. We disagree.

21        At trial, the evidence showed that Thornton pulled a knife on Ware. Thornton stated
         that he would not have brought a knife if he wanted to fight. He told Gardner that
22        he could feel Ware in the area and knew he would run into him, a statement that
         gave Gardner "a chill." RP (Sept. 14, 2015) at 432. When Gardner told Thornton
23        not to hurt Ware, he chuckled and stated, "Oh, I'm not going to hurt him." RP (Sept.

24

14, 2015) at 432–33. Gardner said she would tell if he hurt Ware, and testified that she was concerned for Ware after having had the conversation with Thornton.

During closing arguments, the prosecutor stated, "[Thornton] chuckled when [Gardner] told him not to hurt Ware, to which he said, 'Oh, I'm not going to hurt him. I'm going to kill him.'" RP (Sept. 22, 2015) at 980. Thornton did not object to the prosecutor's remark. Given the context of the evidence and Ware's subsequent injuries, the prosecutor argued a reasonable inference from the evidence that Thornton's intent was not merely to fight Ware, but to stab or kill him.

Thornton fails to show how the remark had a substantial likelihood of affecting the verdict and how it was so flagrant and ill-intentioned that no instruction could have cured any prejudicial effect. Therefore, his argument fails.

*Thornton*, 198 Wash. App. 1026, 2017 WL 1164652 at *6-7; Dkt. 12-1, pp. 28-29.

As detailed by the state court of appeals, during the trial, Gardner testified that she spoke with Petitioner about Ware's whereabouts on the day of the stabbing. *See* Dkt. 12-3, pp. 472-73, 478. Gardner understood Petitioner was looking for Ware regarding a dispute over Ware's failure to return Petitioner's blue-tooth speaker. *Id*. at pp. 475-76. Gardner asked Petitioner if he "pulled a knife" on Ware the weekend before, to which Petitioner responded that he had. *Id*. at p. 473. Petitioner told Gardner that he would not have pulled the knife if he wanted to fight Ware. *Id*. at 473-74. Gardner interpreted Petitioner's statement to mean Petitioner would stab Ware. *Id*. at p. 474. Gardner told Petitioner not to hurt Ware, if he saw him. *Id*. She testified that Petitioner "did like a chuckle and said, 'Oh, I'm not going to hurt him." *Id*. at 478-79. When asked what Gardner's understanding of his statement was, she stated she did not know. *Id*. at 479. The evidence also shows Officer James Lang overheard Gardner say Petitioner told Gardner he was going to stab Ware. Dkt. 12-3, p. 114.

During closing arguments, the prosecutor summarized Gardner's conversation with Petitioner. Dkt. 12-5, pp. 187-88. The prosecutor stated, in relevant part, that Gardner testified Petitioner "chuckled when [Gardner] told him not to hurt Ware, to which [Petitioner] said, 'Oh,

1  I'm not going to hurt him. I'm going to kill him." *Id*. at p. 188. Immediately before the

2  prosecutor made this statement, Petitioner's trial counsel objected to the prosecutor's statements

3  because she was arguing regarding facts that were not in evidence. *Id*. at p. 187. The trial court

4  reminded the jury that the attorneys' comments were not evidence and that the evidence was the

5  testimony of witnesses. *Id*. at pp. 187-88.

6       "Prosecutors have considerable leeway to strike 'hard blows' based on the evidence and

7  all reasonable inferences from the evidence." *United States v. Henderson*, 241 F.3d 638, 652 (9th

8  Cir. 2000); *see also United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993)

9  ("prosecutors must have reasonable latitude to fashion closing arguments, and thus can argue

10  reasonable inferences based on the evidence"), *as amended on denial of reh'g* (Apr. 15, 1993).

11  "A prosecutor may not, however, base closing argument on evidence not in the record." *U.S. v.*

12  *Sanchez-Soto*, 617 Fed. App'x. 695, 697 (9th Cir. 2015).

13       Gardner testified that Petitioner was looking for Ware regarding a dispute over a speaker.

14  Gardner stated Petitioner chuckled when he said he was not going to hurt Ware. While Gardner

15  stated she did not know what Petitioner meant regarding that specific statement, she testified that

16  she interpreted another statement by Petitioner to mean Petitioner was going to stab Ware and

17  had recently "pulled a knife" on Ware. The evidence also shows Gardner said Petitioner told her

18  that he was going to stab Ware. While it appears the prosecutor may have implied Gardner

19  testified Petitioner chuckled and said he was going to kill Ware, considering Gardner's

20  statements in context and the additional evidence presented at trial, Petitioner has not shown the

21  state court's conclusion that the prosecutor's argument was a reasonable interpretation of the

22  evidence is unreasonable.

23

24

1    Even if the prosecutor's remark was an improper misstatement of the evidence, Petitioner

2    has not shown prejudice. Petitioner's conclusory assertions that the one statement from the

3    prosecutor substantially impacted the jury's assessment of Petitioner's intent to harm Ware are

4    insufficient. As discussed above, there was evidence that Gardner interpreted one of Petitioner's

5    statements to mean that Petitioner would stab Ware. There was also evidence that Petitioner told

6    Gardner he was going to stab Ware. The prosecutor's single statement was made during a

7    lengthy closing argument and prior to defense counsel making any closing arguments.

8    Additionally, immediately before the prosecutor made the statement, the trial court provided a

9    curative instruction that the attorneys' statements were not evidence. Based on the record in this

10   case, Petitioner has not shown the alleged prosecutorial misconduct infected the trial in such a

11   way that Petitioner's conviction resulted in a denial of due process.

12    Petitioner has not provided facts sufficient to show a real possibility of constitutional

13   error as a result of the State's alleged misconduct in misstating Gardner's testimony during

14   closing arguments. Therefore, Petitioner has failed to show the state court's conclusion denying

15   Petitioner's prosecutorial misconduct claim regarding Gardner's testimony was contrary to, or

16   was an unreasonable application of, clearly established federal law. Accordingly, the Court finds

17   this claim should be denied.

18    3.    *Witness Vouching*

19    Last, Petitioner asserts the State engaged in prosecutorial misconduct when the

20   prosecutor vouched for Scales. Dkt. 5, pp. 30-32. In determining the prosecutor did not

21   improperly vouch for any witnesses, the state supreme court found:

22    Finally, Mr. Thornton argues that the prosecutor engaged in misconduct during
      closing argument by vouching for Scales. Prosecutorial misconduct requires
23    reversal if there is a substantial likelihood the misconduct affected the verdict. *State
      v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994). In making this determination,

24

the court reviews the prosecutor's conduct in the context of the entire record, including argument, the issues at trial, the evidence addressed in arguments, and the jury instructions. *Id*. at 85-86. If defense counsel did not object to the claimed misconduct as it occurred, the objection is deemed waived unless the misconduct was so flagrant and ill-intentioned that its prejudicial effect could not have been remedied by a curative jury instruction. *In re Pers. Restraint of Glassman*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012).

Here, the prosecutor merely pointed out that the trial evidence corroborated Scales's testimony, and as the acting chief judge noted, the remark was made in response to defense counsel's challenge to Scales' (sic) credibility. A prosecutor is allowed wide latitude in closing arguments to draw reasonable inferences from the facts in evidence and to express such inferences to the jury. *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W. R.*, 181 Wn.2d 757, 765, 336 P.3d 1134 (2014). In these circumstances, the acting chief judge properly dismissed this claim.

Dkt. 12-2, p. 277-78.

"It is improper for the prosecution to vouch for the credibility of a government witness." *United States v. Roberts*, 618 F.3d 503, 533 (9th Cir. 1980). "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *Necoechea,* 986 F.2d at 1276. "[P]rosecutors must have reasonable latitude to fashion closing arguments, and thus can argue reasonable inferences based on the evidence, including that one of the two sides is lying." *Id*.

Here, Petitioner's trial counsel attacked Scales's credibility during closing argument. *See* Dkt. 12-5, pp. 211-17. In her rebuttal closing argument, the prosecutor provided a response to the defense's arguments. *See* Dkt. 12-5, pp. 226-30. The prosecutor stated, in relevant part,

Everything Mr. Scales said was corroborated by law enforcement. Kind of an odd alibi witness corroborated Mr. Scales if he is so off and so unbelievable. He's corroborated by law enforcement.

*Id*. at p. 230.

1    The evidence fails to show the prosecutor vouched for Scales. The prosecutor did not

2    state Scales was honest or credible. Rather, the prosecutor reasonably argued from the evidence

3    that it was unlikely Scales's testimony was unbelievable because it was corroborated by other

4    evidence. Thus, Petitioner has not shown the state court's conclusion was contrary to or an

5    unreasonable application of clearly established federal law. *See Necoechea*, 986 F.2d at 1279 ("It

6    is not vouching, however, for the prosecutor to argue about the truthfulness of a witness's

7    statements based upon evidence in the record, provided that the statements do not imply that the

8    prosecution is personally assuring the witness's veracity or reflect the prosecutor's personal

9    beliefs.").

10    Even if the statement constituted vouching, Petitioner has not shown how the

11    prosecutor's statement that Scales's testimony was corroborated by law enforcement seriously

12    impacted the fairness of his trial. The prosecutor's statement was an invited response to the

13    defense's attempt to discredit Scales. There was additional evidence, beyond Scales's testimony,

14    to support the State's theory of the case, including eyewitnesses to the altercation. The trial court

15    also instructed the jury that the attorneys' statements and arguments were not evidence. Further,

16    the jury was instructed that it was the sole judge of the credibility of each witness. *See* Dkt. 12-2,

17    p. 140. Based on the facts of this case, Petitioner has not shown this single statement regarding

18    Scales's testimony impacted the jury's ability to fairly judge this case or impacted the result of

19    the trial.

20    Therefore, Petitioner has failed to show the state court's conclusion finding the

21    prosecutor did not engage in misconduct by allegedly vouching for Scales was contrary to, or

22    was an unreasonable application of, clearly established federal law, or was an unreasonable

23

24

1    determination of the facts in light of the evidence presented in this case. Accordingly, the Court

2    finds this claim should be denied.

3        4.  *Conclusion*

4        For the above stated reasons, the Court finds Petitioner has not shown the claims of

5    prosecutorial misconduct, viewed singularly or cumulatively, warrant habeas relief. Accordingly,

6    the Court finds Ground 6 should be denied.

7    F.  Speedy Trial (Ground 5)

8        In Ground 5, Petitioner alleges his right to a speedy trial was violated when there was an

9    excessive delay while he was awaiting his trial. Dkt. 5, pp, 17-23.

10        Respondent argues Petitioner's "actual complaint is that the superior court did not

11    comply with the state speedy trial rule under CrR 3.3." Dkt. 11, p. 23. Petitioner's challenge to a

12    violation of a state speedy trial rule is an error of state law and not cognizable in a federal habeas

13    action. *See Estelle*, 502 U.S. at 67-68. However, Petitioner specifically states that his Sixth

14    Amendment speedy trial rights were violated. Dkt. 5, pp. 17-23. Therefore, the Court will

15    analyze Ground 5 as a challenge of Petitioner's speedy trial rights under the Sixth Amendment.

16        "The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall

17    enjoy the right to a speedy and public trial . . ..'" *United States v. Marion*, 404 U.S. 307, 313

18    (1971). "A literal reading of the Amendment suggests that this right attaches only when a formal

19    criminal charge is instituted and a criminal prosecution begins." *United States v. MacDonald*,

20    456 U.S. 1, 6 (1982). The United States Supreme Court has long held "[t]he right of a speedy

21    trial is necessarily relative. It is consistent with delays and depends upon circumstances."

22    *Beavers v. Haubert*, 198 U.S. 77, 87 (1905). Thus, "inquiry into a speedy trial claim necessitates

23

24

REPORT AND RECOMMENDATION - 36

a functional analysis of the right in the particular context of the case." *Barker v. Wingo*, 407 U.S. 514, 522 (1972).

To evaluate a speedy trial claim, the Court should consider the following four factors: "'(1) whether delay before trial was uncommonly long, (2) whether the government or the criminal defendant is more to blame for that delay, (3) whether, in due course, the defendant asserted his right to a speedy trial, and (4) whether he suffered prejudice' because of the delay." *United States v. Beamon*, 992 F.2d 1009, 1012 (9th Cir. 1993) (quoting *Doggett v. U.S.*, 505 U.S. 647, 651 (1992)). The four factors are related and must be considered together with other circumstances relevant to a particular case. *Barker*, 407 U.S. at 533.

In finding Petitioner's speedy trial rights were not violated, the state supreme court stated:

> Mr. Thornton also raises a speedy trial claim arising out of a nine-month delay in his trial proceedings. This is not a matter of constitutional error. *See State v. Smith*, 104 Wn.2d 497, 508, 707 P.2d 1306 (1985). Under RAP 16.4(c)(2) and this court's precedent, Mr. Thornton may not receive relief on this alleged error unless it constitutes a fundamental defect which inherently results in a complete miscarriage of justice. *Gomez*, 180 Wn.2d at 347. Here, as the acting chief judge explained, the alleged speedy trial violation does not meet that description. Much of the delay was caused by continuance requests from defense counsel. Under these circumstances, and under the procedural barriers to relief via personal restraint petition, the acting chief judge properly dismissed this claim.

Dkt. 12-2, p. 277.

Here, the record shows Petitioner was arrested on September 24, 2014 and initially arraigned in the underlying case on September 25, 2014. *See* Dkt. 12-1, p. 19 (Petitioner arrested two days after Ware died); Dkt. 12-2, p. 331. The case was set for trial on November 17, 2014. *See* Dkt. 12-2, p. 331. On November 5, 2014, Petitioner appeared in Court on a joint motion to continue. *Id*. Both the State and Petitioner's counsel sought a continuance until April 2015. *Id*. at p. 333. The trial court determined the case was complicated, Petitioner faced a sentence of up to

1  life imprisonment, and there were multiple witnesses that needed to be interviewed and

2  discovery that needed to be reviewed. *Id*. at pp. 333-36. The trial court found good cause to

3  continue the trial. *Id*. at 336-37. The trial was set for April 14, 2015. *Id*. at p. 337.

4      On March 26, 2014, the trial was rescheduled to July 9, 2015 based on a joint motion to

5  continue filed by both the State and Petitioner's trial counsel. Dkt. 12-2, p. 80. On June 2, 2015,

6  the trial court heard argument on an additional motion to continue filed by the State. Dkt. 12-2,

7  p. 345. The trial court found good cause to continue the trial to August 12, 2015, because the

8  prosecutor was out of the office due to a lengthy and unexpected medical issue. *Id*. at pp. 349,

9  351. On August 6, 2015, the trial was rescheduled to August 25, 2015 based on a joint motion to

10  continue. Dkt. 12-2, p. 96. On August 25, 2015, the trial was rescheduled for September 1, 2015

11  because the prosecutor was in trial. *See id*. at p. 101.

12      In considering the four factors identified in *Barker*, the Court finds Petitioner has not

13  shown the state court's adjudication of this claim was contrary to federal law. The state supreme

14  court primarily determined that much of the delays – the second *Barker* factor – were caused by

15  Petitioner and his counsel. Out of the five continuances, three were filed jointly by Petitioner's

16  trial counsel and the State. The trial court also granted a continuance over Petitioner's objections

17  because the prosecutor took medical leave or was in trial. As such, there is no evidence the

18  State's requests for continuances were the result of deliberate or bad faith delay. *See Doyle v.*

19  *Law*, 464 Fed. App'x 601, 604 (9th Cir. 2011).

20      Petitioner alleges he was prejudiced by the delay because the State would have been

21  unable to provide a key witness without the delays. *See* Dkt. 5. However, Petitioner has not

22  provided evidence, beyond his speculation, that the State would not have been able to present a

23  key witness, Gardner, without the continuances. Rather, the majority of continuances occurred

24

1    prior to the State subpoenaing Gardner. *See* Dkt. 12-2, p. 103 (material witness bench warrant

2    issued for Rayneisha Gardner on August 26, 2015); Dkt. 12-2, p. 106 (declaration in support of

3    bench warrant for Gardner stating Gardner had been in contact with State and defense until

4    August 7, 2015). Therefore, Petitioner failed to adequately show any prejudice resulted from the

5    perceived delay.

6        Overall, Petitioner has not shown the state supreme court's decision that Petitioner's

7    speedy trial rights were not violated is not contrary to, or an unreasonable application of, clearly

8    established federal law. Accordingly, the Court finds Ground 5 should be denied.

9    **III.    Evidentiary Hearing**

10        The decision to hold an evidentiary hearing is committed to the Court's discretion.

11   *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a

12   hearing could enable an applicant to prove the petition's factual allegations, which, if true, would

13   entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is

14   available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the

15   state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not

16   entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the

17   record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district

18   court is not required to hold an evidentiary hearing." *Id*. The Court does not find it necessary to

19   hold an evidentiary hearing because, as discussed in this Report and Recommendation,

20   Petitioner's grounds for relief may be resolved on the existing state court record.

21

22

23

24

### IV.    Certificate of Appealability

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

No jurist of reason could disagree with this Court's evaluation of Petitioner's claims or would conclude the issues presented in the Petition should proceed further. Therefore, the Court concludes Petitioner is not entitled to a certificate of appealability with respect to this Petition.

### V.    Conclusion

For the above stated reasons, the Court concludes the Petition should be denied as Petitioner has not shown the state courts' adjudication of this ground was contrary to, or an unreasonable application of, clearly established federal law. The Court also finds an evidentiary hearing is not necessary. Therefore, the Court recommends the Petition be denied and a certificate of appealability not be issued. The Court, however, recommends *in forma pauperis* continue on appeal.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of de novo review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit

1  imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on

2  March 6, 2020, as noted in the caption.

3       Dated this 18th day of February, 2020.

David W. Christel
United States Magistrate Judge